# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

B.J.R., *a minor child, by and through Maria Garcia, her mother and legal guardian*,

Plaintiff,

v.

JAMES GOLGART, JR., *in his individual capacity*, JORDAN DAVIS, *in his individual capacity*, and THE CITY OF MINNEAPOLIS,

Defendants.

Civil No. 11-1105 (JRT/SER)

**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Zorislav R. Leyderman, **THE LAW OFFICE OF ZORISLAV R. LEYDERMAN**, 222 South Ninth Street, Suite 1600, Minneapolis, MN 55402, for plaintiff.

Darla J. Boggs, Assistant City Attorney, **MINNEAPOLIS CITY ATTORNEY'S OFFICE**, 350 South Fifth Street, Room 210, Minneapolis, MN 55415, for defendants.

Maria Garcia brings this action on behalf of her minor child, B.J.R., against two Minneapolis Police Officers, James Golgart, Jr. and Jordan Davis, and the City of Minneapolis (collectively, "defendants"). B.J.R. alleges that the officers used excessive force in tackling, tasing, and handcuffing her in order to bring her to the Juvenile Supervision Center for a curfew violation. B.J.R. brings a claim pursuant to 42 U.S.C. § 1983 for Fourth Amendment violations, and state tort claims for battery, assault,

intentional infliction of emotional distress, and negligent infliction of emotional distress.[1] Defendants move for summary judgment, claiming they are entitled to qualified immunity on the § 1983 claim and official immunity on the state tort claims.

The Court will deny Golgart's motion for summary judgment on B.J.R.'s § 1983 claim because, taking the facts in the light most favorable to B.J.R., Golgart violated a clearly established constitutional right by taking B.J.R. to the ground using the arm-bar technique and by tasing B.J.R. The Court will find, however, that Davis is entitled to summary judgment on B.J.R.'s § 1983 claim because the minimal force he used was reasonable. As for the tort claims, the Court will deny defendants' motion for summary judgment with respect to the battery and assault claims against Golgart and the assault claim against Davis. It follows that the City of Minneapolis is potentially vicariously liable for those claims. *See* Minn. Stat. § 466.02. The Court will grant defendants' motion for summary judgment on the remaining tort claims.

## BACKGROUND

### I.     THE TRAFFIC STOP

At approximately 3:30 a.m. on December 11, 2010, Golgart and Davis stopped a vehicle with a broken headlight on Lake Street near Pillsbury Avenue South. (Aff. of C. Lynne Fundingsland, Ex. F (Dep. of James Golgart, Jr. ("Golgart Dep.") 67-68, Dec. 31, 2012, Docket No. 28.) Golgart approached the driver's side and Davis

---

[1] B.J.R.'s *Monell* claim against the City of Minneapolis was dismissed with prejudice pursuant to the parties' stipulation. (Order, Jan. 9, 2013, Docket No. 32.)

approached the passenger's side. (Fundingsland Aff., Ex. C (Dep. of B.J.R. ("B.J.R. Dep.") 61-63).) Golgart spoke with the driver, seventeen-year-old M.A.L., while Davis spoke with the passenger, fourteen-year-old B.J.R. (Fundingsland Aff., Ex. D (Dep. of Jordan Davis ("Davis Dep.") 25-26).) Davis claims that B.J.R. told him she was sixteen. (Davis Dep. 26, 33.)

Believing B.J.R. to be in violation of curfew, Davis asked B.J.R. to exit the vehicle and conducted a pat-down search for weapons. (*Id.* 26-27; B.J.R. Dep. 61-63.) B.J.R. claims that Davis lifted her sweater during the pat-down and she pulled it down because it made her uncomfortable. (B.J.R. Dep. 63.) Davis found B.J.R.'s cell phone and threw it into the stopped vehicle. (*Id.* 63; Golgart Dep. 74:18-21; Compl. ¶ 13, Apr. 27, 2011, Docket No. 1.) B.J.R. claims she asked to keep the phone with her because she did not know her mother's new telephone number and Davis refused. (B.J.R. Dep. 64, 67:24-25.) Without handcuffing B.J.R., Davis ordered B.J.R. to get into the back of the squad car and she complied. (*Id.* 64-65.) The driver, M.A.L., was also in the back of the squad car. (*Id.* 64:7.) M.A.L. had no identification or proof of insurance and the officers learned that he had an outstanding felony warrant for aggravated robbery. (Golgart Dep. 68:19-24, 70:2-4.)

While B.J.R. was in the squad car, she claims Davis asked questions that made her uncomfortable, such as whether she was having a sexual relationship with M.A.L. (B.J.R. Dep. 64:11-14.) The officers drove B.J.R. to the Juvenile Supervision Center ("Curfew Center"), which is in the basement of Minneapolis City Hall. (Golgart Dep. 72.) B.J.R. claims she had no idea where she was being taken and did not know how she

would get home.  (B.J.R. Dep. 66:1-4.)  Golgart claims that B.J.R. did not ask to call her

mother until they had left the scene and they told her she could use a phone at the Curfew

Center.  (Golgart Dep. 77:13-25.)  The officers claim that B.J.R. repeatedly demanded

that they give her a ride home to Osseo or arrange a taxi even after they explained that

they were not allowed to leave the city limits and that she could arrange a ride home from

the Curfew Center.  (*Id.* 82-83; Davis Dep. 32.)

## II.  CONFRONTATION AT CITY HALL

When the squad car arrived at City Hall, Davis stayed in the car with M.A.L.

while Golgart entered the building with B.J.R.  (B.J.R. Dep. 66:10-23; Davis Dep. 36-

37.)  Other than continuing to demand a ride home, B.J.R. was cooperative and followed

Golgart into the building on her own accord.  (Golgart Dep. 85-86.)  B.J.R. then stopped

at the top of a set of stairs inside City Hall rather than following Golgart down to the

Curfew Center.  (*Id.* 86-88.)  Golgart walked back up the stairs and tugged on B.J.R.'s

sweater, but B.J.R. "pulled back."  (B.J.R. Dep. 67, 69, 77.)  B.J.R. claims she was

uncomfortable and frightened.  (*Id.* 66, 69.)  Golgart then pulled on B.J.R.'s sweater a

second time, grabbing some of her hair in the process.  (*Id.* 69.)  B.J.R. pulled her arm

away, backed up, and told Golgart to let her go.  (*Id.* 77.)  B.J.R. understood that Golgart

wanted her to follow him, and claims that she would have done so if Golgart had

explained where he was taking her.  (*Id.* 78.)  B.J.R. did not testify that Golgart directly

ordered her to follow him down the stairs.  (*See id.* 66-70, 78.)  Golgart testified that he

told her "to continue walking." (Golgart Dep. 90.)

After B.J.R. pulled her arm away and backed up, without warning Golgart lifted her arm and flipped her onto the ground using an "arm bar technique." (B.J.R. Dep. 70, 77-78; Golgart Dep. 93-94.) B.J.R. hit her head on the concrete floor and "blacked out" for a couple of seconds. (B.J.R. Dep. 70.) B.J.R. ended up on her side with her right arm trapped underneath her while Golgart was on top of her with one knee on her neck and the other knee on her waist. (*Id.*) Golgart called for backup and Davis arrived to try to help Golgart get B.J.R.'s arm out from underneath her. (Golgart Dep. 101; B.J.R. Dep. 70.) B.J.R. states that she had difficulty breathing because of the weight being placed on her and that she was yelling and swearing at the officers to get off of her. (B.J.R. Dep. 71.) Davis weighed 260 pounds, (Davis Dep. 53), Golgart weighed 250 pounds, (Golgart Dep. 97), and B.J.R. weighed 160 pounds, (*id.*).

Golgart had his knee either on B.J.R.'s neck or back, (*Id.* 108, 111), and Davis was holding B.J.R.'s head and using his weight to assist in holding her torso, (Davis Dep. 62). Because he believed B.J.R. was not cooperating in removing her arm from under her body, Golgart warned B.J.R. that he would tase her if she did not stop resisting. (Golgart Dep. 107.) B.J.R. allegedly yelled that she could not get her arm out from under her body because it was trapped. (B.J.R. Dep. 71-73.) Davis claims that B.J.R. tucked her arm further under her body and continued to resist when he tried to pry it out. (Davis Dep. 44.) "One to two seconds" after warning that he would use the taser, Golgart tased B.J.R. on the small of her back in drive stun mode. (Golgart Dep. 107, 109-10.) B.J.R. states that the tase burned intensely and that shortly after she was tased, the officers handcuffed her. (B.J.R. Dep. 74-75.) B.J.R. claims that Golgart asked "How did the tase feel?" (*Id.*

80.)  She claims that at this point her head was hanging off the top stair and Davis said "I ought to kick your head off."  (*Id.* 80-81.)  B.J.R. admits that she was upset and was swearing at the officers.  (*Id.*)

### III.   EVENTS FOLLOWING THE CONFRONTATION

The officers pulled B.J.R. to a seated position against a wall using the chain of the handcuffs and left her seated on the floor for approximately ten minutes while they waited for a sergeant to arrive.  (*Id.* 81-82.)  The officers had called a sergeant because they had used force on B.J.R., (Golgart Dep. 41), and they left her on the ground without touching her anymore because she had called them perverts at some point during the struggle, (*id.* 120-21).   The officers refused to loosen B.J.R.'s handcuffs despite her complaining that she could not feel her fingers.  (B.J.R. Dep. 82.)  When the sergeant arrived he determined that the cuffs were too tight and loosened them.  (*Id.*)  The sergeant told B.J.R. that he was sorry for what had happened to her.  (*Id.* 87.)

The officers had requested an ambulance because B.J.R. complained that her head hurt.  (Davis Dep. 63; B.J.R. Dep. 82.)  Paramedics arrived, examined B.J.R., and left. (B.J.R. Dep. 82-83.)   B.J.R. was then taken to the crime lab in City Hall where her injuries were photographed.  (Golgart Dep. 41, 132; B.J.R. Dep. 83.)

At this point it was 5:00 a.m. and curfew was over so B.J.R. was released.  (B.J.R. Dep. 87-88.)  B.J.R. claims one of the officers told her she could walk home, despite the fact that there was a blizzard and B.J.R. lived over ten miles away in Osseo.  (*Id.* 88.) B.J.R. eventually remembered her mother's telephone number and called her.  (*Id.*)  She

then slept on the floor of the City Hall care center until her mother arrived at approximately 7:00 a.m. (*Id.* 90; Fundingsland Aff., Ex. E (Dep. of Maria Garcia) 29, 31.) B.J.R. was still shaking from the tase and a secretary at the care center had given her a blanket. (B.J.R. Dep. 90-91.)

B.J.R.'s mother took her to the emergency room, where she received a CT scan, was diagnosed with a "closed head injury" and a concussion, and was prescribed ibuprofen. (Aff. of Zorislav R. Leyderman, Ex. 6 ("ER Records") at 1-3, Jan. 21, 2013, Docket No. 34.) Following the incident, B.J.R. received treatment from two therapists at the Washburn Center for Children. (B.J.R. Dep. 93-96.) B.J.R. had nightmares for two weeks, felt paranoid, scared, and unsafe, and did not feel like hanging out with her friends. (*Id.* 96.) In preparation for this litigation, Dr. Stephen B. Olsen met with and evaluated B.J.R. for six hours. (Leyderman Aff., Ex. 7 ("Dr. Olsen Report") at 1, 12.) Dr. Olsen noted that B.J.R. becomes agitated and will cry when she sees police cars, and that her stomach is in knots. (Dr. Olsen Report at 6.) Dr. Olsen opines that B.J.R. is suffering from a "posttraumatic stress disorder" caused by the incident and that it "negatively impacts her day to day functioning." (*Id.* at 10-11.)

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit,

and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    42 U.S.C. § 1983 – QUALIFIED IMMUNITY

B.J.R. alleges that the officers used excessive force in violation of the Fourth Amendment right to be free from unreasonable seizures by "(1) slamming B.J.R. to the ground without justification; (2) kneeing B.J.R. on the neck and wa[ist] and restricting her airflow without justification; (3) tasing B.J.R. in the back while she was on the ground, trapped underneath Officer Davis, and unable to move, breath[e], or talk; and, (4) tightening B.J.R.'s handcuffs too tight and refusing to loosen B.J.R.'s handcuffs when she complained that her wrists hurt." (Compl. ¶ 54.)

The officers contend they are entitled to qualified immunity, which shields government officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether to grant summary judgment on the basis of qualified immunity, the "court states the facts most favorably to the plaintiff[],discounting the [officers]' contrary evidence." *See Small v. McCrystal*, 708 F.3d 997, 1002 (8th Cir. 2013). The Court considers whether the facts

alleged, "construed most favorably to the plaintiff[]," (1) establish a violation of a constitutional right and (2) establish that the "right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful." *Id.* at 1003. "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." *Nelson v. Correctional Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009).

## A.    Constitutional Violation

"Claims of excessive use of force by law enforcement in the course of seizing a person are to be analyzed under the Fourth Amendment's reasonableness standard." *McVay ex rel. Estate of McVay v. Sisters of Mercy Health Sys.*, 399 F.3d 904, 908 (8th Cir. 2005). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). The Court considers "the totality of the circumstances and focus[es] on factors such as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). Considering the totality of the circumstances in the present case, the Court concludes that a reasonable factfinder could find that Golgart used excessive force in

violation of the Fourth Amendment both by taking B.J.R. to the ground with the arm bar technique and by tasing her.[2]

First, B.J.R.'s crimes were not severe or violent. She contends that her only offense was a curfew violation, which is a mere "status" offense. Defendants contend that she committed obstruction of legal process when she refused to follow Golgart down the stairs and pulled away from him, but even if B.J.R. committed obstruction of legal process, the offense was a non-violent misdemeanor in the present case. *See* Minn. Stat. § 609.50, subd. 2(3); *see also Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (concluding that tasing was unreasonable because, among other things, plaintiff's conduct, which was a misdemeanor punishable by not more than ninety days' imprisonment, "did not amount to a severe or violent crime").

Second, B.J.R. realistically posed little or no immediate threat to the officers' safety. The officers knew that B.J.R. was unarmed because Davis had frisked her during the traffic stop. Prior to the confrontation on the steps, B.J.R. showed no indication that she would become physically violent and had followed all of the officers' instructions, including getting into and out of the squad car without serious objection. Even if B.J.R. had shown a propensity for physical violence, it is not clear that she would have presented an immediate threat to Golgart's safety because Golgart outweighed her by almost one hundred pounds. A recent Eighth Circuit case, *Johnson v. Carroll*, is instructive. 658 F.3d 819 (8th Cir. 2011). In *Johnson*, the plaintiff interrupted officers'

---

[2] The Court will address Davis's conduct below.

attempts to arrest her nephew by hugging him and telling him to get down on the ground. *Id.* at 823. An officer threw her to the ground and she suffered a torn anterior cruciate ligament. *Id.* at 823-24. The court concluded that the force was unreasonable because, among other things, "[plaintiff] posed at most a minimal safety threat to the officers" and "[t]here [wa]s no evidence that [plaintiff] actively pushed the officers away from [her nephew], threatened them, or took any other action against them." *Id.* at 827. Similarly, B.J.R. posed at most a minimal safety threat and did not actively make physical contact with the officers.

Third, viewing the facts in the light most favorable to B.J.R., B.J.R. was not attempting to evade arrest by flight or actively resisting in a manner that justified the force used. Defendants emphasize that B.J.R. pulled her arm away from Golgart and moved backward after he tried to pull her down the stairs to the Curfew Center. Slight resistance "**may** justify the use of greater force," *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1008 (8th Cir. 2003) (emphasis added), but the Court must consider the totality of the circumstances.

Here, B.J.R. contends that she pulled her arm away and moved backward slightly because she was frightened and uncomfortable, and that she would have followed Golgart down the stairs if he had explained where he was taking her. *Cf. Johnson*, 658 F.3d at 827 (concluding that officer's force may have been excessive, in part, because plaintiff alleged that she did not receive verbal commands prior to the use of force). Further, B.J.R. was suspected of only a non-violent misdemeanor and posed little or no threat to the officers' safety or the safety of others. B.J.R. also posed little risk of escaping as she

was inside City Hall, mere steps away from Golgart. Considering these facts, it was unreasonable for Golgart to dramatically escalate the amount of force applied without warning by using the arm-bar technique to flip B.J.R. to the ground and slam her head on the concrete. *Cf. Wertish v. Krueger*, 433 F.3d 1062, 1066-67 (8th Cir. 2006) (concluding that officers reasonably took suspect to the ground after suspect, whom officers reasonably assumed was "a belligerent drunk," "drove erratically and dangerously for many miles" during a chase and "failed to comply with orders to get out of his vehicle"); *Estate of McVay*, 399 F.3d at 908-09 (concluding that an officer's "tackle" of a fleeing hospital patient was reasonable because the patient was "exhibiting signs of lacking mental control" and "was barreling toward glass doors that [the officer] knew would not open, . . . pos[ing] a threat at least to himself").

Defendants also argue that B.J.R. struggled and resisted the officers' efforts to handcuff her. B.J.R. asserts, however, that her arm was pinned under her body, that she was struggling to get it free, and that she yelled at the officers that her arm was trapped. B.J.R.'s lack of violent behavior, lack of physical prowess in comparison to the officers, and her attempts to tell the officers why she was not producing her hands all separate this case from *Carpenter v. Gage*, 686 F.3d 644, 647, 650 (8th Cir. 2012), relied on by defendants. Viewing the facts in the light most favorable to B.J.R., the Court finds that she was not attempting to flee or actively resisting in a manner that justified the arm-bar technique or the taser. *See, e.g.*, *Shekleton v. Eichenberger*, 677 F.3d 361, 365-66 (8th Cir. 2012) (concluding that tasing was unreasonable even though an officer testified to feeling threatened, because the suspect was an unarmed misdemeanant who did not

resist arrest, attempt to run, or behave aggressively). For these reasons, the Court concludes that a reasonable jury could find that Golgart used excessive force by taking B.J.R. to the ground with the arm-bar technique and by tasing her.

The Court finds, however, that Davis did not use excessive force. Though B.J.R.'s complaint does not distinguish between Officers Golgart and Davis in its allegations, the two officers' conduct was quite different. Davis was not present when Golgart took B.J.R. to the ground using the arm-bar technique. He entered City Hall after Golgart radioed for assistance and discovered Golgart and B.J.R. on the floor with Golgart attempting to control B.J.R. According to B.J.R., Davis put his body weight on her and attempted to remove her arm from underneath her body. Davis also testified that he used one hand to restrain B.J.R.'s head. Davis did not use his taser. B.J.R. does not allege that Davis's conduct caused any injury beyond temporary discomfort.

The Court finds that the minimal force used by Davis was reasonable, as a matter of law, given the circumstances. No reasonable factfinder could find that Davis acted unreasonably by using minimal force in an attempt to resolve the struggle that he discovered between Golgart and B.J.R. when he entered City Hall. Similarly, B.J.R.'s claim fails to the extent that it is based on Golgart placing his weight on her to restrain her once she was on the floor. Once Golgart and B.J.R. were on the floor, it was objectively reasonable, as a matter of law, for Golgart to use his weight to ensure that B.J.R. was restrained. Finally, the officers are entitled to qualified immunity on B.J.R.'s claims that they over tightened the handcuffs and refused to loosen them. *See Crumley*, 324 F.3d at 1008 ("[A] claim of nerve damage resulting from being handcuffed too

tightly [i]s not tantamount to excessive force in the absence of medical records indicating any long-term injury as a result of the handcuffs." (internal quotation marks and alterations omitted)).

### B. Clearly Established

Having determined that the facts, taken in the light most favorable to B.J.R., could amount to a constitutional violation based on Golgart's use of the arm-bar technique and the taser, the Court must next determine whether a reasonable factfinder could determine that the constitutional right was clearly established. *Nelson*, 583 F.3d at 528. As a general matter, "[t]he right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998). The Court must determine, more specifically, whether it was clearly established at the time of the incident, taking the facts in the light most favorable to B.J.R., that Golgart's conduct violated the right to be free from excessive force. *See Brown*, 574 F.3d at 499 ("A right is clearly established if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." (internal quotation marks omitted)). "Although earlier cases need not involve fundamentally or materially similar facts, the earlier cases must give officials fair warning that their alleged treatment of the plaintiff was unconstitutional." *Johnson*, 658 F.3d at 828 (internal quotation marks omitted).

The Court finds that the law was sufficiently clear at the time of Golgart's actions for a reasonable officer to know that both the arm-bar technique and the taser were

unlawful in the circumstances. According to B.J.R., she stood at the top of the stairs and asked Golgart to take her home, then pulled away and moved backward slightly after he pulled on her sweater and grabbed her hair. Again, according to B.J.R., Golgart then suddenly and without warning or orders violently flipped B.J.R. to the ground, causing her to hit her head on the concrete. A reasonable officer would understand that this amounts to excessive force. *See id.* ("[T]he law [i]s sufficiently clear to inform a reasonable officer that it [i]s unlawful to throw to the ground and mace a nonviolent, suspected misdemeanant who was not fleeing or herself resisting arrest, who posed little or no threat to anyone's safety, who never received verbal commands to remove herself, and whose only action was to engage in a protective maneuver."). Further, according to B.J.R., while both officers pinned her to the ground, she yelled that her arm was trapped underneath her body and she could not free it with them on top of her. A reasonable officer would have understood that it is unlawful to tase B.J.R. for failing to put her hand behind her back in this situation. *See Brown*, 574 F.3d at 499 ("[T]he law [i]s sufficiently clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator.").[3]

---

[3] Defendants conceded at oral argument that B.J.R. suffered greater than de minimis injury because she was diagnosed with a concussion. The Eighth Circuit has not addressed whether a concussion is more than de minimis and the Court finds that B.J.R.'s injuries were not de minimis. *See, e.g.*, *Johnson v. Jacobson*, 3:06-CV-0766, 2008 WL 2038882, at *6 (N.D. Tex. Apr. 28, 2008) ("According to . . . [h]ospital [r]ecords, Plaintiff suffered a concussion, a serious

(Footnote continued on next page.)

The Court recognizes that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 396-97, but nonetheless finds, for all the reasons above, that Golgart is not entitled to qualified immunity on B.J.R.'s claims that his use of the arm-bar technique and the taser amounted to excessive force in violation of the Fourth Amendment.

## III. STATE TORT CLAIMS – OFFICIAL IMMUNITY

B.J.R. brings claims for battery, assault, intentional infliction of emotional distress, and negligent infliction of emotional distress against all defendants. The City of Minneapolis is potentially vicariously liable for the torts of its officers. *See* Minn. Stat. § 466.02. Defendants contend the officers are protected from state tort liability by official immunity, which "protects from personal liability a public official charged by law

_____

(Footnote continued.)

injury."); *cf. Foxworth v. Major*, C/A No. 8:08-2795, 2009 WL 2368737, at *8 (D.S.C. July 30, 2009) ("[T]he plaintiff's medical records establish that the plaintiff suffered nothing more than a de minimis injury. . . . The plaintiff was diagnosed with a mild contus[]ion – not a concussion as the plaintiff alleges in his complaint."). A concussion is more serious than a "back contusion" with "no bruising or swelling" and "no acute distress," *Chambers v. Pennycook*, 641 F.3d 898, 902 (8th Cir. 2011), "relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition," *Wertish*, 433 F.3d at 1067, or "very minor injuries, likely nothing more than the temporary and slight aggravation of pre-existing conditions," *Andrews v. Fuoss*, 417 F.3d 813, 818 (8th Cir. 2005), all of which have been held to be de minimis. Having concluded that B.J.R.'s injuries were not de minimis, the Court need not consider the impact of the Eighth Circuit's 2011 holding that "given the state of the law" prior to 2011, a reasonable officer making an arrest "could have believed that as long as he did not cause more than de minimis injury to an arrestee, his actions would not run afoul of the Fourth Amendment." *Chambers*, 641 F.3d at 908 (emphasis in original).

with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful or malicious wrong." *Rico v. State*, 472 N.W.2d 100, 106-07 (Minn. 1991). "Generally, police officers are classified as discretionary officers entitled to that immunity." *Johnson v. Morris*, 453 N.W.2d 31, 42 (Minn. 1990). The purpose of official immunity is to ensure that officers can "perform their duties effectively, without fear of personal liability that might inhibit the exercise of their independent judgment." *Mumm v. Mornson*, 708 N.W.2d 475, 490 (Minn. 2006).

The exception for willful and malicious conduct applies only when an officer knows or has reason to know he or she is doing something illegal:

> The defendant must have reason to know that the challenged conduct is prohibited. The exception does not impose liability merely because an official intentionally commits an act that a court or a jury subsequently determines is a wrong. Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited.

*Rico*, 472 N.W.2d at 107 (emphasis omitted). Willful and malicious are considered synonymous in this context, *see id.*, and "[w]hether or not an officer acted maliciously or willfully is usually a question of fact to be resolved by a jury," *Morris*, 453 N.W.2d at 42.

## A. Battery

A battery is "an intentional, unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980). Police officers, however, have statutory authority to come into contact with a person without their consent when making a lawful arrest. *See* Minn. Stat. § 609.06, subd. 1(1)(a). The statute allows the use of "reasonable force" when the officer "reasonably believes" that

he or she is making a lawful arrest. *Id.* Therefore, in order to successfully make a battery claim against an officer, a plaintiff must establish that the physical contact was unreasonable, not merely that it was non-consensual. *Johnson v. Peterson*, 358 N.W.2d 484, 485 (Minn. Ct. App. 1984) ("[T]he unreasonableness of the force used is an element of the action and the burden of proving such unreasonableness is on plaintiff.").

For the same reasons that the Court found that Golgart is not entitled to qualified immunity on B.J.R.'s excessive force claim, it finds that Golgart is not entitled to official immunity on B.J.R.'s battery claim. A genuine dispute of fact remains as to whether Golgart acted maliciously or willfully. A reasonable jury could find that Golgart had reason to know that his use of the arm-bar technique and the taser was excessive given the circumstances. Conversely, a reasonable jury could not find that Davis acted willfully or maliciously by helping to restrain B.J.R. and attempting to remove her arm from underneath her body after he entered City Hall and discovered Golgart and B.J.R. struggling on the floor.

### B. Assault

An assault is an unlawful threat to do harm made by one having the present ability to carry out the threat. *See Morris*, 453 N.W.2d at 41; *Dahlin v. Fraser*, 288 N.W. 851, 852 (Minn. 1939). The threat must create in the plaintiff a "reasonable apprehension of immediate bodily harm." *Dahlin*, 288 N.W. at 852. "The use of threatened force by a peace officer is lawful if it is a reasonable use of force when used in affecting an arrest. *Morris*, 453 N.W.2d at 41. Viewing the facts in the light most favorable to B.J.R., the

Court finds that a reasonable jury could find that both Golgart and Davis willfully or maliciously committed assault based on Golgart threatening to tase B.J.R. while she was underneath the two officers and Davis telling B.J.R. "I ought to kick your head off" when she was already handcuffed on the floor. A jury could find that the officers should have known that both statements were illegal because B.J.R. posed no threat at the time the threats were made. *See Madison v. City of Minneapolis*, Civ. No. 02-4257, 2004 WL 1630953, at *9 (D. Minn. July 15, 2004).

### C. Intentional and Negligent Infliction of Emotional Distress

Intentional infliction of emotional distress ("IIED") contains four elements: (1) extreme and outrageous conduct; (2) done intentionally or recklessly; (3) the conduct causes emotional distress; and (4) the distress is severe. *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003). A plaintiff alleging negligent infliction of emotional distress ("NIED") must establish the four elements of a typical negligence claim (i.e., duty, breach, causation, and harm), and also three additional elements: (1) that the plaintiff was within the zone of danger of physical impact created by the defendant's negligence; (2) that the plaintiff reasonably feared for her own safety; and (3) that the plaintiff suffered severe emotional distress with attendant physical manifestations. *Engler v. Ill. Farmers Ins. Co.*, 706 N.W.2d 764, 767 (Minn. 2005).

The Court finds that B.J.R.'s IIED and NIED claims both fail because she has not presented evidence of severe distress. Under Minnesota law, "'the law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to

endure it.'" *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439 (Minn. 1983) (quoting Restatement (Second) of Torts § 46 cmt. j (1965)) (alteration omitted). Minnesota courts have rejected IIED claims with evidence of distress that was at least as severe, if not more severe, than B.J.R.'s. *See, e.g.*, *Elstrom v. Indep. Sch. Dist. No. 270*, 533 N.W.2d 51, 57 (Minn. Ct. App. 1995) ("[Plaintiff] suffered insomnia, crying spells, a fear of answering her door and telephone, and depression, which caused her to seek treatment. This does not state a valid [IIED or NIED] claim."). Thus, the Court finds that defendants are entitled to summary judgment on B.J.R.'s IIED and NIED claims.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment [Docket No. 25] is **GRANTED in part** and **DENIED in part** as follows:

1.  Defendants' motion for summary judgment on B.J.R.'s § 1983 claim (Count I) is **GRANTED** with respect to Davis and **DENIED** with respect to Golgart.

2.  Defendants' motion for summary judgment on B.J.R.'s assault claim (Count III) is **DENIED**.

3.  Defendants' motion for summary judgment on B.J.R.'s battery claim (Count IV) is **GRANTED** with respect to Davis and **DENIED** with respect to Golgart and the City of Minneapolis.

4.    Defendants' motion for summary judgment on B.J.R.'s intentional infliction of emotional distress claim (Count V) is **GRANTED**.

5.    Defendants' motion for summary judgment on B.J.R.'s negligent infliction of emotional distress claim (Count VI) is **GRANTED**.


DATED:  July 9, 2013                             ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                 United States District Judge